**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHARLES BRANDON MARTIN          *

Petitioner                      *

v.                              *          Civil Action No. JRR-20-2602

JEFFREY NINES and               *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND               *

Respondents                     *
                            ***

## MEMORANDUM OPINION

Petitioner Charles Brandon Martin filed the instant Petition For Writ of Habeas Corpus (ECF Nos. 1, 2, 21, 30; the "Petition") against Respondents Warden Jeffrey Nines and Maryland Attorney General. Respondents.  The Petition was originally filed by Martin *pro se.*  Following his engagement of counsel, Martin's retained counsel submitted a supplemental petition (ECF No. 2), which concedes that certain of Martin's claims in his *pro se* Petition were unexhausted and clarifies that Martin proceeds on only two claims for relief.  ECF No. 21. On February 19, 2021, new/substitute counsel appeared on behalf of Martin. ECF No. 24. New counsel sought leave to file an amended brief, which asserts five claims for relief, including the two claims in previous counsel's supplemental brief.  ECF Nos. 25, 28. On April 19, 2021, the Court granted Martin leave to file his amended brief, limited to the five claims raised in the amended brief. ECF No. 29.  These five claims, detailed below, are before the Court for disposition.[1]

---

[1] Pursuant to Order of April 24, 2023 (ECF No. 35), Respondents supplemented the record with Exhibit "E" from the postconviction hearing (ECF No. 36-1), which is discussed in detail, *infra*, in connection with Martin's Ground One for relief.

No hearing is required.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons that follow, the Petition as to Claim One is GRANTED.  A certificate of appealability shall not issue on the denial of Claims Two, Three, Four, and Five.

## I.      BACKGROUND

### A.    The Trial

Martin was charged on April 3, 2009, in Anne Arundel County, Maryland, in a ten-count indictment related to the attempted murder of Jodi Torok. ECF No. 5-2 at 73-77. On April 24, 2009, Martin filed a demand for a bill of particulars, seeking to find out, *inter alia*, whether the state intended to prove that he acted as a principle to the attempted first degree murder in the first or second degree. ECF No. 5-1 at 78-80. The trial court denied Martin's motion at a hearing on October 14, 2009, ruling there was no authority for the proposition that the state was required to advise the defense of its theory of the case in advance of trial. ECF No. 5-3 at 10-27.

A jury trial was held from April 27 through May 5, 2010. The Appellate Court of Maryland summarized the facts adduced at trial as follows:

> October 27, 2008, Jodi Lynne Torok, the victim, was found at her home in Crofton, Maryland, with a gunshot wound to her head. Having survived that wound, the victim testified, at the trial below, that she had been in a romantic relationship with Martin, who was married to someone else, and that about eight or nine weeks before the shooting, she had become pregnant with his child. After the victim informed Martin of her condition, he angrily demanded that she obtain an abortion. Although she had, at first, agreed to do so, she later changed her mind and decided to have the baby. Upon informing Martin of her change of mind, the victim advised him of her intention "to go to court and take him for child support." Predictably, that advisement led to cooling of their relationship.

> Subsequently, on the day of the shooting, at about 3:00 pm, the victim was talking on the phone, at her home, with a close friend, Blair Wolfe,[4] when a man, purporting to be a salesman, knocked on her front door. She then ended the call to

respond to the "salesman," but thereafter never called Ms. Wolfe back or answered any of Wolfe's subsequent telephone calls. Growing increasingly concerned but unable to take any action on her own,[5] Ms. Wolfe telephoned Jessica Higgs, the victim's roommate, and requested that she leave work and return home to make sure that the victim was safe. Upon arriving at the residence that she shared with the victim, Ms. Higgs found the front door unlocked and the victim lying on the foyer, unconscious and bleeding from a gunshot wound to her head. Higgs immediately called "911."

When the first police officer arrived at the victim's residence, he secured the scene. Then, upon entering the residence, he found the victim, Ms. Torok, "laying in the doorway," "fully clothed," still breathing, but unresponsive. There were no signs of forcible entry or that the victim's personal property had been disturbed.

When paramedics arrived at the scene, they transported the victim to the Shock Trauma Center at the University of Maryland Hospital in Baltimore City, where she remained for nearly a month. As a result of the gunshot wound, the victim's pregnancy was terminated, and she suffered severe and disabling injuries. Neither during that time nor thereafter could she recall the events that took place, from the end of her telephone conversation with Ms. Wolfe on October 27th until Thanksgiving, one month later. The evidence recovered by the police at the scene of the shooting included a Gatorade bottle, which appeared to be fashioned into a home-made silencer;[6] a spent projectile as well as a spent shell casing; and the victim's Blackberry cell phone.

**Gatorade bottle/silencer**

From the Gatorade bottle, police evidence technicians extracted "a human hair" of "Negroid origin"[7] and saliva from the mouth of the bottle. DNA testing of both linked the bottle to Martin.[8]

The victim testified that neither she nor Ms. Higgs drank Gatorade, but that Martin did and often.[9] Martin's fondness for Gatorade was later confirmed by the officer who drove him to the Anne Arundel police station, who testified that, on the way to the station, he and Martin stopped at a convenience store, where Martin purchased a bottle of Gatorade to drink. Granted immunity from prosecution for the shooting and possibly for other unrelated charges, Michael Bradley testified that, on the day of the shooting; he; his brother, Frank Bradley; Martin; and Jerry Burks, an acquaintance of Martin, were together at Maggie McFadden's house "about noon" and that he observed Frank Bradley carrying "some white . . . medical tape" and a Gatorade bottle upstairs to McFadden's bedroom, where he was joined by Martin. Then, according to Michael Bradley, Martin and Burks left together, "approximately 1:30, 2:00" p.m., and returned after 3:00 pm. but before 6:30 pm. the same day.[10]

3

Finally, Sheri Carter, one of Martin's former girlfriends,[11] testified that Martin, approximately one month before the shooting, while at her residence, used a computer to conduct internet research on how to assemble a home-made silencer. She further stated that, during the first week of November 2008, approximately one week after the shooting and shortly after Martin had been questioned by police, Martin took the computer from her apartment, telling her "that [they] had looked up so many crazy things on the internet that in case [Carter's] apartment got searched [Martin] didn't want it found there." Martin, in her words, then "got rid of" the computer.

### Ballistic evidence

The bullet recovered by police, a .380 caliber bullet, and the shell casing that was found, could have been fired, according to a State's expert witness, from a semi—automatic firearm. Such a firearm could have been manufactured by any one of sixteen different manufacturers, which was consistent with Martin's purchase, in 2003, of two .380 caliber semi—automatic handguns made by Bryco Arms, one of those sixteen manufacturers."[12] Moreover, Sheri Carter testified that, in September and October of 2008, the time period just before the shooting, she had observed Martin carrying a "small, silver, [black-handled], semi-automatic" handgun. The firearm itself was never found. The testimony of Michael Bradley suggested why that was so. According to Michael Bradley, when Martin returned to McFadden's home the evening of the shooting, he saw Martin give a brown paper bag to Frank Bradley and tell Bradley to "get rid of this."

### Victim's cell phone

Finally, the last of the four items found at the victim's residence was her Blackberry cell phone. Text messages extracted from that phone by police confirmed that Martin had exchanged several text messages with the victim on the day of the shooting.[13]

### Martin's statement

The day after the shooting, Martin gave a statement to police. During the interrogation, Martin downplayed his relationship with Ms. Torok, the victim, telling detectives that he did not know her last name and that he was unsure where she lived, but he conceded that he had previously been to her house. And, although he was "highly doubt[ful]" that he was the father of the Victim's baby, since they "hadn't had any contact," he admitted to police that he had agreed to provide money to her to "help her out." Finally, Martin claimed that, on the day of the shooting, he was at home with his wife and children until mid—day and that later he had visited "Frankie" and "Mike" Bradley, who were friends of his, arriving at "around" 1:00 p.m., staying with them until about 4:30 p.m., and then returning home.

[4] At other parts of the record, her name is spelled "Blaire Wolfe."
[The Appellate Court of Maryland] adopt[ed] the spelling used in

the State's discovery disclosure. Ms. Wolfe did not testify at Martin's trial.

⁵ At the time of this telephone call, Ms. Wolfe was living in Pittsburgh.

⁶ The mouth of the Gatorade bottle was wrapped with two layers of tape, and at the bottom of the bottle was a hole. The tape exhibited a distinct, rectangular shape, a shape suggesting that the mouth of the bottle had been pressed against the barrel of a semi-automatic handgun. Furthermore, sooty residue lined the bottle's inside surface at the location of the hole, indicating that that opening at the bottom of the bottle had been made by an exiting bullet. It appeared, to police, to be a home-made silencer.

Martin is an African-American male.

⁸ Martin's mitochondrial DNA profile was the same as that derived from the hair strand. One of the State's expert witnesses testified at trial that only about 0.06 per cent of the population of North America shares the same mitochondrial DNA profile as that derived from the hair fragment found on the Gatorade bottle.

DNA testing of a swab of saliva taken from the mouth of the bottle revealed that it contained "a mixture of DNA from at least three individuals," at least one of whom was female and another a male. The test results excluded "approximately 94 percent of the Caucasian population," as well as "approximately 96 percent of the African—American population," but among the males, who could not be excluded, was Martin. And, among the females, who could not be excluded, was the victim, Jodi Torok.

⁹ The victim stated that Martin drank Gatorade "a lot."

¹⁰ "The State's theory was that Burks was the shooter and that he had been solicited by Martin. Burks was tried separately, six months before Martin's trial, on charges that included attempted first- and second-degree murder and conspiracy to commit murder. He was acquitted by a jury on all counts. Five days before Martin's trial, the State moved in limine to "exclude from trial any evidence that Jerold Burks was acquitted of the charges" in that case, and, on the day trial commenced, the court granted that motion. Thereafter, the State nol prossed the conspiracy charge against Martin.

¹¹ In addition to his wife, Martin had at least three girlfriends with whom he maintained intimate relations.

[12] The parties stipulated that, in 2004, one of those handguns "was transferred to another party."

[13] Police technicians used a device known as a universal memory exchanger ("UME"), that extracts the data stored on a cell phone, including text messages.

ECF No. 5-1 at 211-217. Before the case was submitted to the jury on May 4, 2010, the state dismissed all counts, except attempted first degree murder and solicitation to commit murder. The jury found Martin guilty of attempted first degree murder, but not guilty of solicitation to commit murder. ECF No. 5-10 at 4. Martin was sentenced on December 21, 2010, to life imprisonment. ECF No. 5-13 at 84.

**B.**      **Direct Appeal**

Martin noted a direct appeal to the Appellate Court of Maryland raising seven errors. Relevant to his federal habeas petition, Martin contended that the trial court erred by failing to provide him with a bill of particulars and that he was denied due process when the state changed its theory of the case mid-trial. Particularly, Martin argued that he was prejudiced by the denial of a bill of particulars because his defense was based on an alibi that became worthless when the state changed its theory to accessory before the fact during the trial. ECF 5-1 No. at 120.  The Appellate Court of Maryland affirmed Martin's conviction on July 30, 2014. *Id.*  at 209-259.  Martin's petition for certiorari to the Supreme Court of Maryland was denied on November 20, 2014. *Id.*  at 261-275; 284.

**C.**     **Postconviction Proceedings**

Martin filed a *pro se* petition for postconviction relief on September 18, 2015, which he amended on October 15, 2015. *Id.* at 285-307. Martin's counsel filed a supplemental petition on January 6, 2017. *Id.* at 308-334. Pertinent to these proceedings, Martin asserted: the state suppressed a laptop computer forensic report in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)

(ECF No. 5-1 at 329-30); trial counsel was ineffective for failing to object to impermissible compound voir dire questions (*Id.* at 323-24); trial counsel was ineffective for failing to object to a burden-shifting argument in the state's closing (*Id.* at 327-28); and he was denied due process when the state changed its theory of the case mid-trial. *Id.* at 330-331.

The postconviction court held a hearing on June 23, 2017. ECF No. 5-14. Charles Brandon Martin, his trial counsel, Edward Stamm, and his mother, Doris Martin testified. The state called Detective Daniel Giambra of the Anne Arundel digital forensics unit, who examined the laptop related to Martin's *Brady* claim. The postconviction court issued an opinion on October 5, 2018, granting postconviction relief on three separate issues and ordering a new trial. ECF No. 5-1 at 372-403. The postconviction court found that the state suppressed exculpatory and impeaching evidence that undermined confidence in the outcome of the trial when it failed to produce a forensic report analyzing a laptop that was seized from Martin's residence. *Id.* at 374-79. The postconviction court also found that Martin's trial counsel was ineffective for failing to object to impermissible compound voir dire questions and failing to object to the prosecution's burden shifting arguments during closing statements.[2] *Id.* at 387-90; 393-96.

The Appellate Court of Maryland granted the state's application for leave to appeal the postconviction court's order. *Id.* at 458-59. On September 20, 2019, the Appellate Court of Maryland reversed the trial court, *in toto*, finding that the *Brady* claim failed because the evidence was not material and the ineffective assistance of counsel claims failed because Martin could not show deficient performance or prejudice. *Id.* at 618-60. The Supreme Court of Maryland denied

---

[2] The trial court also found that Martin's trial counsel was ineffective for failing to file a motion to challenge his sentence before a three-judge panel but found the issue moot considering a new trial was granted. ECF No. 5-1 at 396-97.

Martin's petition for certiorari on January 24, 2020. *Id.* at 707. The United States Supreme Court denied *certiorari* on June 1, 2020. *Id.* at 708-41; *Martin v. Maryland*, 140 S. Ct. 2836 (2020).

### D.      The Federal Petition

Martin filed his federal petition on September 9, 2020. ECF No. 1. As discussed above, five claims are before the Court: (1) the state violated *Brady v. Maryland* when it suppressed the forensic laptop report; (2) trial counsel was ineffective because he failed to object to compound voir dire questions; (3) trial counsel was ineffective because he failed to object to the state's burden-shifting closing argument; (4) the trial court erred when it failed to require the state to provide a bill of particulars; and (5) the state denied Martin due process when it changed its theory of the case mid-trial.

## II.      PROCEDURAL DEFAULT

Procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted."). As the United States Court of Appeals for the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has

procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619 (citing *Coleman*, 501 U.S. at 731-32).

For a person convicted of a criminal offense in Maryland, exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Appellate Court of Maryland and then to the Supreme Court of Maryland by way of a petition for a writ of certiorari. *See* MD. CODE ANN., CTS. & JUD. PROC. §§ 12-201, 12-301. To exhaust a claim through post-conviction proceedings, a defendant must assert the claim in a petition filed in the Circuit Court in which the inmate was convicted within 10 years of the date of sentencing. *See* MD. CODE ANN., CRIM. PROC. §§ 7-101–7-103. After a decision on a post-conviction petition, further review is available through an application for leave to appeal filed with the Appellate Court of Maryland. *Id.* § 7-109. If the Appellate Court of Maryland denies the application, there is no further review available, and the claim is exhausted. MD. CODE ANN., CTS. & JUD. PROC. § 12-202).

A procedural default occurs when a habeas petitioner fails to exhaust such available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 735 n.1). Maryland law does not permit a second and successive state petition for post-conviction relief. *See* MD. CODE ANN., CRIM. PROC. § 7-103(a).

Respondents contend that Martin's Claim Five, arguing that his due process rights were violated because the state changed its theory mid-trial, is procedurally defaulted. Respondents cite to language in the Appellate Court of Maryland's opinion on direct appeal noting that Martin did not argue that he was statutorily entitled to a bill of particulars on the charges for which he was acquitted or *nolle prossed*, including assault and reckless endangerment for the proposition that

9

Claim Five was dismissed on independent state grounds. [3] ECF No. 31 at 50-51. The ambiguous language cited by Respondents in the Appellate Court of Maryland's opinion does not qualify as an independent and adequate state ground sufficient to procedurally default Claim Five because it did not "clearly and expressly" dismiss the claim on state grounds. It appears as though the appeals court was acknowledging that Martin was not arguing a statutory entitlement to a bill of particulars because the charges entitling him to same had been dropped.

In any event, the record reflects that Martin's federal habeas claim was raised and addressed on direct appeal; namely that he was denied a bill of particulars on his *principle to attempted first degree murder* charge and he was denied due process because the state changed its theory of prosecution mid-trial. *Id.* at 230-242. Respondents' argument that this claim is unexhausted and procedurally defaulted is without merit; the Court will therefore address this claim on the merits.

### III.    STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard

---

[3] Respondents rely on the Appellant Court of Maryland's statement, "Martin does not, however, rely upon Criminal Law § 3-206(b) or (d) and, in fact, makes no mention of those statutory subsections in either his initial or reply brief. Instead, his dispute with the State's response to his demand for a bill of particulars focuses specifically and only on the State's theory of his criminal agency with respect to the attempted murder charges. We further presume that that is because the assault and reckless endangerment charges were nol prossed by the State, or, as in the case of first-degree assault, subsumed into the greater offense, attempted first-degree murder. Moreover, the conspiracy charge was also [nolle] prossed and thus, despite being the focal point of much of the argument below, is no longer a part of this case. Furthermore, Martin was acquitted of the solicitation charge, extinguishing its relevance and removing it from further consideration."

is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement")).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."

*Wood v. Allen*, 558 U.S. 290, 301 (2010).  "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts.  *Id*.  "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly."  *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."  *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).  This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)."  *Id*. at 379.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 137 S.Ct. 759, 775 (2017).  To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88.  *See Williams*, 529 U.S. at 390.  First, the petitioner must show that counsel's performance was deficient.  Second, the petitioner must show that he was prejudiced by the deficient performance.  *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775.

12

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688; *see Harrington*, 562 U.S. at 104. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690). The Supreme Court recently reiterated that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775. Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (citation omitted). The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. Judicial scrutiny of counsel's performance must be "'highly deferential'" and not based on hindsight. *Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir. 2021) (citing *Strickland*, 466 U.S. at 689).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Id.* at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.  Nor must a court address both components if one is dispositive.  *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015).  This is because failure to satisfy either prong is fatal to a petitioner's claim.  As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## V.     ANALYSIS

### A.     Claim One- Violation of *Brady v. Maryland*

The state's theory at trial was that Martin was an accessory before the fact because he made or assisted in making a homemade gun silencer out of a Gatorade bottle that was used in the attempted murder of Jodi Torok. To prove its theory, the state offered testimony regarding law enforcement's discovery of the Gatorade bottle, lay testimony tying Martin to the fashioning of the Gatorade bottle as a silencer, and expert ballistics, DNA, and forensics testimony.

Sergeant Richard Alban testified that he discovered the Gatorade bottle at the crime scene near the couch. ECF No. 5-5 at 125-26.  When the prosecutor asked Detective Alban what the bottle reminded him of, he responded:

> It -- in watching movies -- I like action movies - and I have seen a movie where Steven Seagal — I hate to—my wife would kill me for saying this—but had a bottle. He used a two-liter plastic bottle that he attached to the end of a weapon and he fired a projectile through it in order to—he was going around stealth. He was

not trying to get caught by — there was a bunch of bad guys looking for him and he used the two-liter bottle to deaden the noise of the -- of his weapon being fired, and I also saw stuff on YouTube where they show you how to make silencers out of plastic bottles and other items.

*Id.* at 128.

On cross, defense counsel asked Sergeant Alban whether he was aware that Gatorade bottles could be used as marijuana bongs, and he acknowledged that it would not surprise him that a Google search on creating one would render 300,000 hits. *Id.* at 137. Detective Alban was the first witness at trial to suggest that the Gatorade bottle was a homemade silencer. No expert witness was called by the state to substantiate Alban's theory or confirm the possibility that the bottle could have been used in such a manner.

Anne Arundel County crime scene technician Rebecca Caliendo testified that she removed and examined duct tape from the mouth of the Gatorade bottle. ECF No. 5-1 at 173-174. She conducted no testing on the bottle or the tape, including testing for gunshot residue or marijuana. *Id.* at 178. She did see something on the tape that appeared to be hair or fiber. *Id.* at 179. Anne Arundel crime scene technician Craig Robinson removed white tape from the Gatorade bottle and submitted it to David Exline at the RJ Lee Group lab for trace analysis. ECF No. 5-6 at 9-10. Robinson did not test the bottle for gunshot residue or marijuana. *Id.* at 28-29. Oral swabs, which were taken from Martin by Kimberly Morisette, were sent to RJ Lee Group and Mitotyping Technologies for analysis. *Id.* at 19; 64-67.

David Exline of RJ Lee Group testified as an expert in forensic examination. *Id.* at 72. He received two pieces of white medical tape on November 7, 2008. *Id.* at 84. Three fibrous trace materials were removed from the tape. *Id.* at 84. One was animal hair and one was human hair. *Id.* at 85-86. The human hair, 4 millimeters long, was transferred to Mitotyping Technologies for mitochondrial DNA testing on March 21, 2009. *Id.* at 91. Exline testified that the white tape found

on the mouth of the Gatorade bottle had similar characteristics to the white tape located during execution of the search warrant of 2572 Interchrist Place, Waldorf Maryland (Maggie McFarland's residence). *Id.* at 97-101; ECF No. 5-6 at 129-130. Crime scene technician Jay Potter collected the white tape from a dresser drawer in a second-floor bedroom. *Id.*

Dr. Terry Melton of Mitotyping Technologies testified about the mitochondrial DNA testing that was performed on the hair received from RJ Lee Group collected from the white medical tape. ECF No. 5-7 at 78-120; ECF No. 5-8 at 14-45. Dr. Melton was qualified as an expert in mitochondrial DNA and explained that nuclear DNA is found in the center of the cell and contains genetic information from both parents, whereas mitochondrial DNA is found outside of the nucleus of the cell and only contains genetic information from the maternal line. *Id.* at 94-96. Dr. Melton further explained, "when we say we have a mitochondrial DNA test going on we're looking to see if that person could have left that sample, but we can never say for sure they did leave that sample." *Id.* at 97.

Dr. Melton testified that she received the hair fragment and the saliva swab from Martin and was able to develop a mitochondrial DNA profile on both samples. *Id.* at 108-113. Dr. Melton concluded that the profiles were the same, meaning that Martin and his maternal relatives could not be excluded as the contributors of the hair located on the white medical tape. *Id.* at 113. Dr. Melton further added that 99.94% of North Americans would not have the mitochondrial DNA profile found in the samples. *Id.* at 114. On cross-examination, Dr. Melton acknowledged that 180,000 people in the United States would have the same profile and 30,000 people in Maryland. *Id.* at 24-25.

Anne Arundel County senior forensic chemist, Sarah Chenowith, testified about the nuclear DNA testing performed on the saliva found on the mouth of the Gatorade bottle. ECF No. 5-8 at

45-83. Chenowith found a DNA mixture on the mouth of the bottle that was from three individuals, including one female and one male. *Id.* at 59. Chenowith testified that she could not rule out Martin as a contributor to the DNA on the bottle, but neither could she rule out the victim as a contributor. *Id.* at 73-75. She was, however, able to rule out five other individuals whose DNA was submitted for comparison. *Id.* at 75;80.

Arnold Esposito, an expert in firearms, ammunition, and toolmark identification, testified that he examined the shell casing collected from the crime scene. ECF No. 5-6 at 181-215. He concluded that the gun that fired the bullet could have come from sixteen different manufacturers, one of which was a .380 caliber Jennings. *Id.* at 194, 198. Esposito testified that Martin purchased two .380 Jennings firearms on March 14, 2003. *Id.* at 197-198.

Michael William Bradley testified that he knew Martin because Martin dated his sister Maggie McFadden. ECF No. 5-8 at 86-87. Bradley lived at Maggie's house with his brother, Frank Bradley, and Maggie's daughter, Nanna McFadden. *Id.* at 89. Bradley testified that in October of 2008, Martin frequently visited and stayed over at the house. *Id.* at 89. Around the fall of 2008, Bradley testified that he saw Martin with a handgun in Maggie's room. *Id.* at 91-96. Bradley testified that, the day of the shooting, he saw Martin enter the residence around noon, followed by Jerry Burks; and that Frank was in the house drinking somewhere. *Id.* at 97-99.

Bradley testified that they all sat around smoking marijuana; that Frank, Jerry Burks, and Martin were in the house; and that he saw Jerry and Martin in the kitchen rolling blunts. *Id.* at 100. They smoked five or six blunts that day; "[w]e just kept smoking and smoking." *Id.* He also testified that he saw Frank come down the steps with white medical tape, and that he saw Frank and Brandon go upstairs to Maggie's room; and then saw Frank run back upstairs with a Gatorade bottle. *Id.* at 100-101. When he saw Frank with the Gatorade bottle, Martin was in Maggie's room

and Frank went into Maggie's room with the bottle. *Id.* Bradley further testified that later, Burks and Martin left, and when they returned, Bradley saw Martin hand Burks a brown paper bag and said, "get rid of this." *Id.* at 116-117. Bradley never testified that he saw Martin with either the white medical tape or the Gatorade bottle.

On cross-examination Bradley admitted that he received an immunity agreement from the State of Maryland in exchange for his testimony. *Id.* at 117. The agreement dropped his fugitive from justice warrant and immunized him from any criminal liability in connection with Jodi Torok's attempted murder. *Id.* at 118-119. While it is unclear from Bradley's testimony whether he understood this term, the agreement provided a benefit to Bradley on pending obstruction of justice charges in New Jersey. *Id.* at 127-135. Bradley also admitted on cross-examination that he pled guilty to obstruction of justice because he lied to the police. *Id.* at 123.

Sherri Carter testified that she engaged in an intimate relationship with Martin for three years, starting in December of 2005, and that she never knew Martin was married. *Id.* at 140-42. Carter testified further that Martin kept a computer at her house while they were dating and that she saw Martin looking up gun silencers on the computer around the end of September, beginning of October in 2008. *Id.* Carter described the interaction as follows:

> A:    We were at -- I think we were watching Law and Order on TV and we had a conversation about how they were illegal and only policemen were allowed to buy them, and I remember it because I didn't know that at the time.
>
> Q:    Did you ask him why he was looking at silencers?
>
> A:    No.
>
> Q:    What was his reaction when you asked him about what he was looking at on the internet that day?

A:      He didn't like it when I looked over his shoulder and looked at what he was looking up online and generally he would tell me kind of like to stop looking over what he was doing.

Q:      Do you still have the computer that he was using that day to look at silencers on the internet?

A:      No.

Q:      Was that his computer or your computer?

A:      It was his computer.

Q:      Did you ever use it?

A:      Yes.

Q:      What was unique about that computer?

A:      It was — he told me that he had got it from a place that he used to work and we didn't have administrative rights so you couldn't make any changes to the computer because we didn't have the password log in. So you couldn't download anything, you couldn't basically alter the computer.

Q:      What happened to that computer?

A:      He took it from my apartment.

Q:      Did you ask him about that?

A:      Yes. He said that we had looked up so many crazy things on the internet that in case my apartment got searched he didn't want it found there.

Q:      Did he say what he did with it?

A:      He said he got rid of it.

Q:      When was this?

A:      It was the first week in November 2008.

*Id.* at 143-144.

Physical evidence presented at trial tied Martin to the Gatorade bottle; however, the only trial evidence that established that Martin intended to fashion a Gatorade bottle into a homemade

silencer was Sherri Carter's internet search testimony. Carter's testimony is the only evidence suggesting that the Gatorade bottle was, in fact, used as homemade silencer in the attempted murder of Jodi Torok.

After Martin's conviction for attempted first degree murder based on accessory before the fact, his mother, Dorris Martin, sent a public records request to the police for their entire file. ECF No. 5-14 at 83-84. The request yielded a never produced computer forensics report. ECF No. 36-1. Martin based his postconviction *Brady v. Maryland* claim on the content of this document.

At the postconviction hearing, held on June 23, 2017, Charles Brandon Martin testified that his former employer, the College of Southern Maryland (CSM), gave him one laptop, and that during the time he knew Sherri Carter, he used it. ECF No. 5-14 at 98-99. Martin testified further that he never saw the computer forensic report received in the public record request before trial. *Id.* The report was entered in evidence as Exhibit "E."

Exhibit "E" shows that lead investigator Detective Mike Regan requested forensic analysis of five computers seized from Martin's residence. Detective J.M. Knisley conducted the analysis and prepared the report. Of the five computers seized, three were desktops and two were laptops. ECF No. 36-1.  A Gateway laptop was examined, showing the registered owner as "CSM" and the last login of May 19, 2005. *Id.* at 5-6. The report indicates analysis yielded negative results for the following search terms: "handgun," "Gatorade," "silencer," "contract murder," "murder for hire," "homemade silencer," and "hitman."[4]

---

[4] Other search terms, whose relevance is not immediately apparent, were also negative. Term searches were run on four of the computers, including the Gateway laptop. It is unclear why a term search was not conducted on the Dell laptop. The report indicates that the data on the Dell laptop had "no investigative value." ECF No. 36-1 at 8.

Trial counsel, Leonard Stamm, testified at the hearing that he compared the search warrant inventory and confirmed that a Gateway laptop had been seized from Martin's house. *Id.* at 40-41. Stamm testified further that the forensic report indicates that the laptop was owned by CSM. Sheri Carter testified that Martin used a CSM laptop to research use of a Gatorade bottle as a silencer. *Id.* at 42-43. Stamm testified that the computer forensic report would have undermined Sheri Carter's testimony because it shows that the CSM laptop was never used to research using a Gatorade bottle as a silencer. *Id.* at 42. Stamm also testified that if the computer analysis report had been produced, he would have had grounds to object to the state's jury instruction about concealment of evidence suggesting consciousness of guilt. *Id.* at 43-44.

The state called Daniel Giambra of the Anne Arundel police department digital forensics unit to testify. *Id.* at 109-164. Giambra was contacted one week before the hearing to conduct a second forensic analysis of the computer and produce a report. *Id.* at 118,121; ECF No. 5-1 at 358-360. No evidence was introduced as to why the state did not call the author of Exhibit "E," Detective J.M. Knisley, or why a second analysis of the computer had any bearing on the state's failure to produce Exhibit "E" prior to trial. The hard drive of the computer failed ten minutes into Giambra's analysis. ECF No. 5-14. In the ten minutes he was able to analyze the computer, he determined that the hard drive was last accessed on May 19, 2005. *Id.* at 122. Giambra testified that, in his opinion, the computer was not used in 2008. *Id.* at 125.

No evidence was introduced at the hearing regarding why the original forensic report was not produced to the defense (Exhibit "E"). During argument following testimony, the state's attorney advised the postconviction judge that Detective Regan asked that the report be created, but never turned the report over to the prosecution. *Id.* at 188-89.

21

The postconviction court issued an opinion on October 5, 2018, ECF No. 5-1 at 372-403, finding that a *Brady* violation had occurred, concluding that the evidence was both exculpatory and impeaching because it undermined Sheri Carter's testimony and showed that Martin did not destroy evidence. *Id.* at 377-379. The postconviction court determined that the state conceded the evidence was suppressed and the suppression was likely "willful." *Id.* at 379-81. The postconviction court also found there was a reasonable probability of a different outcome had the evidence been produced. *Id.* at 381-383.  The opinion discussed the impact of Carter's testimony, acknowledging that she was the only witness that saw Martin researching homemade gun silencers. Reasoning that materiality of the suppressed document was based on the fact that the essential link between Martin and the victim was the silencer, the opinion quotes from the state's closing argument: "If you decide that [Martin] made that silencer and that silencer was intended to be used upon the victim then he is guilty."  *Id.* at 382-83. The postconviction court also concluded there would have been no jury instruction on concealment of evidence had the forensic report been produced. *Id.* at 382.

The postconviction court ordered a new trial based on the *Brady* violation. *Id.* at 403. The Appellate Court of Maryland reversed the postconviction court and reinstated Martin's conviction. As discussed below, however, the Appellate Court of Maryland employed a *Brady* analysis contrary to applicable federal law and, in the opinion of the court, imposed an unreasonable application of the facts to the law.

*Brady v. Maryland* instructs, "the suppression by the prosecution of evidence favorable to an accused" violates due process where the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).  For a court to find a *Brady* violation, it must determine that the evidence was 1) favorable to the accused, 2)

suppressed by the prosecution (either willfully or inadvertently), and 3) material. *Banks v. Dretke,* 540 U.S. 668, 691 (2004). Evidence that is favorable to the accused includes both exculpatory (whether requested by defendant or not) and impeachment evidence. *Id.*; *see United States v. Bagley,* 473 U.S. 667, 676 (1985) (holding that the *Brady* rule includes impeachment evidence).

The touchstone of materiality is a "concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104 (1976). Accordingly, an individual alleging a *Brady* violation must demonstrate that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). Although this analysis can entail an examination of the nature and strength of the prosecution's case, the materiality test is not an evaluation of the sufficiency of the non-suppressed evidence; nor does it require the defendant to prove, by a preponderance of the evidence, that he would have been acquitted if the suppressed evidence had been disclosed. *See Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995). The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290 (1999), quoting *Kyles,* 514 U.S. at 435.

On appeal, the State conceded, and the Appellate Court of Maryland agreed, the information in the suppressed computer forensic report was favorable to Martin because it could have been used to impeach Ms. Carter's testimony that Martin used the computer to search for information regarding gun silencers. ECF No. 5-1 at 630.

23

The Appellate Court of Maryland discussed the evidence it considered supportive of the verdict, including the mitochondrial and nuclear DNA on the Gatorade bottle, the similar characteristics of the medical tape removed from the Gatorade bottle, the tape found during the search of Maggie McFadden's home, the testimony of Michael Bradley, the ballistic evidence showing Martin owned a gun that could have shot the recovered shell from the crime scene, the state's theory that Martin had a motive to kill the victim,[5] and text messages from Martin to the victim the morning of the shooting the state argued were sent for the purpose of confirming the victim was home at the time of the shooting.

As an initial matter, the Court notes that the Appellate Court of Maryland's recitation of Michael Bradley's testimony, by clear and convicting evidence, is inconsistent with his trial testimony:

> He saw [Martin] and his brother, Frank Bradley, going back and forth between Ms. McFadden's room and the kitchen with white medical tape and a Gatorade bottle.

ECF No. 5-1 at 634. The trial record reflects that Michael Bradley did not testify he saw Martin with white medical tape or a Gatorade bottle. Bradley testified that Martin was in an upstairs bedroom when he saw Frank Bradley go up and down the stairs with the tape and the bottle. ECF No. 5-8 at 101.

---

[5] Worth mentioning is the Appellate Court of Maryland's omission of relevant facts related to the state's theory of motive. On both direct appeal and postconviction appeal, the court placed weight on the state's theory that Martin had a motive to kill Torok because she was carrying his child and refused to have an abortion. However, in both opinions, the Appellate Court of Maryland omitted to mention that Jodi Torok testified on cross-examination that the child may have been fathered by another man she was seeing at the time, Emmanuel Quartley. ECF No. 5-5 at 51. Quartley also testified at trial that he was in a romantic relationship with Torok, they had unprotected sex, and he was aware the child may have been his. *Id.* at 113-114. During the police interview played for the jury, Martin stated that Torok mentioned the pregnancy to him but he "highly doubted" that he was the father because she had a boyfriend, and denying they had any "contact." ECF No. 5-6 at 162.

Despite the Supreme Court's direction to the contrary, the Appellate Court of Maryland did not engage in a proper sufficiency of the evidence inquiry and did not consider the elements of the crime in assessing materiality. The Appellate Court of Maryland did not consider how the computer forensic report placed the facts of the case in a different light, which had the effect of undermining confidence in the verdict, particularly given the prosecution's burden of proof for accessory before the fact to first degree murder. Notably, the Appellate Court of Maryland found materiality by making an overly broad conclusion that Martin was "connected" to the attempted murder:

> Given all the evidence connecting [Martin] to the attempted murder, [Martin] has not met his burden of showing that, had the Computer Analysis been provided to [Martin], there is a reasonable probability that the result of his trial would have been different.

ECF No. 5-1 at 636.

"In order to determine the aggregate effect of the withheld evidence, the court must *both* add to the weight of the evidence on the defense side all of the undisclosed exculpatory evidence *and* subtract from the weight of the evidence on the prosecution's side the force and effect of all the undisclosed impeachment evidence." *Juniper v. Zook*, 876 F.3d 551, 568 (4th Cir. 2017) (internal citations omitted) (emphasis in original). The Appellate Court of Maryland neglected to properly subtract the force and effect of Carter's testimony from the prosecution's case in considering the elements of accessory before the fact to attempted first degree murder.

To find Martin guilty, his jury was instructed:

> The Defendant is charged with being an accessory before the fact to the crimes of attempted first-degree murder, attempted second-degree murder, and first-degree assault. In order to convict the Defendant the State must prove that the crimes of attempted first-degree, attempted second-degree murder, or first-degree assault were committed by another, and that before the attempted first-degree murder, attempted second-degree murder, or first-degree assault were committed the

Defendant **aided, counseled, commanded, or encouraged the commission of the crime with the intent to make the crime succeed**.

ECF No. 5-9 at 27-28 (emphasis added).

"In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime. Likewise, we may find impeaching evidence to be material where the witness supplied the only evidence of an essential element of the offense. This is especially true where the undisclosed matter would have provided the only significant basis for impeachment. *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013) (internal citations omitted); *see also United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (internal citations omitted). In contrast, impeachment evidence is not material if it is 'cumulative of evidence of bias or partiality already presented and thus would have provided only marginal additional support for the defense.'" *Id.*

While the DNA evidence places Martin in physical contact with the bottle, it does not establish that the bottle was used as a silencer or that Martin intended for the bottle to be used as a silencer in the attempted murder of Jodi Torok. Indeed, there are various non-inculpatory explanations for the presence of DNA from Martin, the victim, and an animal on the Gatorade bottle.

The trial evidence, other than Carter's testimony, that potentially tied Martin to creation of the homemade silencer was Michael Bradley's testimony that he saw Frank Bradley going up and down the stairs with a Gatorade bottle and medical tape, and in and out of a bedroom where Martin was located. Bradley's testimony, contrary to the recitation of facts in the Appellate Court of Maryland's opinion, never places the bottle or tape in Martin's possession and is extremely tenuous. Michael Bradley was admittedly intoxicated when he witnessed these events and received a substantial benefit in exchange for his testimony.

The Appellate Court of Maryland acknowledged in footnote fourteen of its opinion that the jury instruction regarding concealment of evidence likely would not have been given had the computer forensic report not been suppressed. ECF No. 5-1 at 636. The jury was instructed:

> You have heard evidence that the Defendant removed a computer from the house of Sheri Carter. Concealment of evidence is not enough by itself to establish guilt but may be considered as evidence of guilt. Concealment of evidence may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether the Defendant concealed any evidence in this case. If you find that the Defendant concealed evidence in this case then you must decide whether that conduct shows a consciousness of guilt.

ECF 5-9 at 23. The Appellate Court of Maryland, consistent with the remainder of the opinion, found the jury instruction to be without impact because of "the strong evidence of [Martin]'s guilt." *Id.* This jury instruction, however, permitted the jury to infer consciousness of guilt as to all elements of the crime from Carter's testimony regarding destruction of the computer.

Reasonable minds would not disagree that the state's burden of proof relied on evidence that that Martin "aided, counseled, commanded, or encouraged" the attempted murder of Jodi Torek by creating the homemade silencer. Absent Carter's testimony, the state cannot prove this element of the crime. The state's burden of proof also included evidence that Martin had "intent to make the crime succeed."  Absent Carter's testimony that Martin endeavored to create the silencer by researching how to do so on the internet, the state cannot meet this element of the crime. Without Carter's testimony, the jury would not have been instructed that there was evidence Martin concealed evidence and that such concealment may be viewed as consciousness of guilt.

Carter's testimony substantiated a mere theory from Detective Alban based on a Steven Seagal movie that a Gatorade bottle found in the victim's home was a homemade silencer. Without Carter's testimony, the Gatorade bottle is simply a Gatorade bottle, and the presence of Martin's

DNA is completely innocuous. In the opinion of the Court, that Martin may have had motive and means because he owned one of sixteen possible types of weapons used in the shooting would not have been sufficient to carry the state's burden. Carter's testimony was the only evidence that established a silencer was used, that it was fashioned from a Gatorade bottle, and that Martin "aided, counseled, commanded, or encouraged" the act, and "intended the crime to succeed."

The state's only evidence to meet its burden of proof as to the essential elements was Carter's testimony, which was dramatically discredited and undermined by the suppressed document. Further, the suppressed document provided the only basis for impeachment of Carter's testimony. Reasonable jurists would not disagree, therefore, that the suppressed computer forensic report was material.

Martin is entitled to habeas relief on Ground One.

**B.      Claim Two-Ineffective Assistance of Counsel/Compound Voir Dire Questions**

In Claim Two, Martin contends that his trial counsel was ineffective for failing to object to inappropriate compound voir dire questions:

> (1) "There will be testimony in this case regarding interracial dating. Is there any prospective juror who has such strong feelings against interracial dating that, that juror would not be able to render a fair and impartial verdict in this case?" There were no positive responses to the question.

> (2) "Have you or any member of your family or close friend(s) ever been associated with, or in any way, involved with a group or organization whose mission is to abolish legalized abortion? Does any member of the jury hold such strong views about abortion that if there is evidence in the case about abortion, you could not be fair and impartial?" There were no positive responses to the question.

ECF No. 5-4 at 73; 90. Martin argues, as he did in his postconviction petition, that the questions violated *Dingle v. State*, 361 Md. 1 (2000), which prohibits questions that require the prospective jurors to evaluate their own bias. The trial court agreed with Martin and granted postconviction relief on this claim (ECF No. 5-1 at 387-390), which was reversed by the Appellate Court of

Maryland (*Id.* at 636-45). Upon review of the applicable precedent, the Court finds that the Appellate Court of Maryland's conclusion was neither contrary to, nor an unreasonable application of, federal law.

The law on compound jury selection questions evolved over a 14-year period in Maryland, starting with *Dingle v. State* and concluding in 2014 with *Pearson v. State*, 437 Md. 350 (2014).  In *Dingle*, the Appellate Court of Maryland held that the trial court erred when it asked several two-part questions concerning whether jurors had certain experiences or associations, and, if so, whether those experiences and associations would affect their ability to be fair and impartial. *Dingle,* 361 Md. at 8-9. The *Dingle* court found the questions objectionable because it "endorses a voir dire process that allows, if not requires, the individual voir dire venire person to decide his or her ability to be fair and impartial...the procedure…shifts from the trial judge to the venire the responsibility to decide juror bias." *Id.* at 21.

Although the Appellate Court of Maryland rejects voir dire questions that call upon jurors to find and evaluate their own biases, in 2002 it approved the phrasing of a self-assessment question in *State v. Thomas*, 369 Md. 202 (2002).  The issue on appeal in *Thomas* was whether the trial court erred in refusing to ask: "Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts at trial where narcotics violations have been alleged?"  The Appellate Court of Maryland found the trial court erred by not permitting the question.  Following *Thomas*, "[as] of May 10, 2002…the state of the law appeared to be that *Dingle* did not apply to a 'strong feelings' compound question." *State v. Davis*, 249 Md. App. at 226.

Following *Thomas*, Maryland appellate courts affirmed similar two-part questions in *Sweet v. State*, 371 Md. 1 (2002) ("Do the charges stir up strong emotional feelings in you that would affect

your ability to be fair and impartial in this case?"); *Baker v. State*, 157 Md. App. 600 (2004) ("Do you

have any bias or prejudice concerning handguns which would prevent you from fairly weighing the

evidence in this case?"); *Singfield v. State*, 172 Md. App. 168 (2006) ("Does any member of the jury

panel feel that the nature of this case would make it difficult or impossible for you to render a fair and

impartial verdict, specifically because this case involves murder with a handgun?"); and *State v. Shim*,

418 Md. 37 (2011) ("Does any member of the jury have such strong feelings about [the charges] that

it would be difficult for you to fairly and impartially weigh the facts?").

In *Pearson v. State*, the Appellate Court of Maryland abrogated the precedent that permitted

two-part "strong feelings" questions, recognizing that while *Dingle* prohibited two-part questions that

required jurors to assess their own biases, the "strong feelings" line of cases that followed and

specifically permitted such two-part questions created a conflict in the law.   437 Md. 350, 361-63

(2014)   Thus, between *Dingle* in 2000 and *Pearson* in 2014, two-part "strong feelings" questions

were permissible during voir dire.

In *State v. Davis*, 249 Md. App. 217 (2021), the date of the petitioner's trial was a central issue

in assessing whether his trial counsel was ineffective. The petitioner in *Davis,* like Martin*,* argued that

his trial counsel was ineffective for failing to object to a multi-part voir dire question that required

jurors to self-assess their biases.[6] Recognizing that Davis's trial occurred in 2007, the Court of Special

Appeals held:

> Based on the law as it existed at the time of trial, Mr. Davis's trial
> counsel's failure to object to the two-part "strong feelings" voir dire
> question was not a deficiency in counsel's defense of Mr. Davis.

*Id.* at 230.

---

[6] "The charges, as you may have heard, involve an allegation of attempted murder. Does the
nature—and also kidnapping. Do the nature of the charges themselves, just alone, stir up such
strong feelings in you that you cannot be a fair and impartial juror in this case?" *State v. Davis,*
249 Md. 217, 219 (2021).

Martin's trial occurred in 2010, while Maryland law permitted two-part "strong feelings" questions; and the voir dire questions posed during Martin's jury selection were permissible at the time. Accordingly, Martin's trial counsel was not deficient for failing to object. The Appellate Court of Maryland's dismissal of this claim was neither contrary to, nor an unreasonable application of, federal law.

**C.      Claim Three- Ineffective Assistance of Counsel/Prosecution's Closing Argument**

In Claim Three, Martin contends that his counsel was ineffective because he failed to object during the prosecution's closing argument when it made two "burden-shifting" statements. Martin claims that the following sections of the prosecutor's closing argument suggested to the jury that Martin, and not the state, bore the burden of proof for a conviction:

> I guess they didn't want you to really think about it, but they didn't address the fact that this Defendant did purchase the two .380 caliber handguns...
>
> They want to pretty much pin this case on Maggie. . . . [I]sn't that easy, doesn't it make it simple for the Defense to be, it's not my client, it's the girl who's not here? And really what evidence do we have that Maggie did it? We have that she— perhaps they proved that she's a rude person. Perhaps they proved that she has a big mouth and that she has bad manners. What else do they prove to tie her to this crime? Nothing. We know that she was at work that day, so certainly she was not the shooter...

ECF No. 5-9 at 92; 94. In its postconviction opinion, the trial court found that these statements impermissibly shifted the burden of proof to the defense and Martin's trial counsel was ineffective for failing to object. ECF No. 5-1 at 393-396. The Appellate Court of Maryland reversed, concluding that the comment about the handgun was a proper response to the defense closing argument that there was no evidence that Martin was guilty and the comment about "Maggie" was a "closer call," but did not warrant reversal because Martin failed to prove prejudice. *Id.* at 645-654.

The Appellate Court of Maryland's dismissal of Claim Three was neither contrary to, nor an unreasonable application of, federal law. The trial court accurately instructed the jury as to the burden of proof (ECF No. 5-9 at 17-18), and there is no indication in the context of the entire trial that the instruction was disregarded by the jury as a result of the two isolated statements during the state's closing arguments. Martin has failed to overcome the doubly-deferential standard of review applied to the state court's determination of ineffective assistance of counsel claims. Based on the foregoing, Martin is not entitled to federal habeas relief on this claim.

**D.     Claims Four and Five-Failure to Provide Bill of Particulars/Denial of Due Process**

In Claims Four and Five, Martin contends that the trial court erred in failing to require the state to respond to his request for a bill of particulars and he was deprived of due process because he was unable to properly prepare for trial without the bill of particulars. Martin contends that he was denied due process because the prosecution changed theories mid-trial by arguing that he was an accessory before the fact instead of an aider and abettor. ECF No. 30 at 18. Martin raised this claim in his direct appeal and in postconviction. ECF No. 5-1 at 90; 330-31. The Appellate Court of Maryland concluded that Martin was not statutorily entitled to a bill of particulars nor was he entitled to be informed in advance of trial of the state's theory of the case. The appellate court rejected Martin's argument that he was prejudiced because the state changed its theory to "accessory before the fact" mid-trial because the state advanced the theory during its opening statement. *Id.* at 230-242. The postconviction court adopted the appellate court's conclusion that Martin was not entitled to a bill of particulars and rejected the argument that the state changed its theory mid-trial. *Id.* at 397.

Martin's argument regarding his entitlement to a bill of particulars and denial of due process relies entirely on Maryland statutory and case law. *Id.* at 117-20; ECF No. 30 at 17-19. A

claim that rests solely upon an interpretation of Maryland law is not cognizable on federal habeas review. *See Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991). Indeed, there is no constitutional right to a bill of particulars. *See United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir. 1987). The Maryland state courts rejected the factual premise of Claim Five, determining that Martin was aware of the state's theory of the case from the beginning of the trial. Absent clear and convincing evidence to the contrary, the Court is bound to accept the state's conclusion. *See* 28 U.S.C. §2254(e)(1). In any event, Martin fails to provide the Court with any applicable federal authority supporting his arguments for relief in Claims Four and Five. Accordingly, the Maryland courts' dismissal of Claims Four and Five is neither contrary to, nor and unreasonable application of, federal law.

## VI.   CERTIFICATE OF APPEAL

Having found that Claims Two, Three, Four, and Five of the Petition for Writ of Habeas Corpus do not present a claim upon which federal habeas relief may be awarded, this Court must consider whether a certificate of appealability should issue. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right as to Claims Two, Three, Four, and Five, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2). Martin  may still request that the United States Court of Appeals for the Fourth Circuit issue such

a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

## VII.   CONCLUSION

For the reasons set forth herein, the Petition is GRANTED as to Claim One and DENIED in all other respects.  The subject conviction and sentence shall be vacated, and the case remanded to the Circuit Court for Anne Arundel County for a new trial.  This Court's judgment shall be STAYED FOR THIRTY (30) DAYS to permit a notice of appeal or, absent same, decision by the Circuit Court for Anne Arundel County as to Martin's continued confinement.

/S/

December 14, 2023

Julie R. Rubin
United States District Judge